FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 JUL 22 PM 1:05

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DONALD THOMAS-BEY,<br>Plaintiff | * | |
| | * | |
| v. | | Civil Action No. JFM-14-1041 |
| | * | |
| WARDEN FRANK BISHOP, et al.,<br>Defendants | * | |
| | ****** | |

## MEMORANDUM

Donald Thomas-Bey, is an inmate currently confined at the North Branch Correctional Institution in Cumberland, Maryland. Thomas-Bey filed the instant civil rights complaint against Defendants, Officer William S. Bohrer, Major Robert Friend, Lt. Bradley Wilt, Sgt. Walter Iser, Jamie Farris, CO II Craig Peters, CO II Ryan Kalbaugh, Officer Leroy Conrad, and Warden Frank Bishop alleging that on March 18, 2014, he was subjected to excessive force. ECF 1. Pending are defendants' motion to dismiss, or in the alternative, for summary judgment. ECF 16. Plaintiff has not filed a response.[1] The court will dispense with a hearing. *See* Local Rule 105.6. (D. Md. 2014). For the reasons stated below, the court will, by separate Order, GRANT defendants' dispositive motion.

Background

---

[1] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on December 9, 2014, plaintiff was notified that defendants had filed a dispositive motion, the granting of which could result in the dismissal of his action. ECF 17. Plaintiff was also informed that he was entitled to file materials in opposition to that motion within seventeen (17) days from the date of that letter and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the court. *Id.*

1

In the instant case, plaintiff indicates that on March 18, 2014, he was in his bed in his cell when he heard a knock on his cell door. Plaintiff walked to his cell door and an officer directed him to "cuff up" but did not explain why. Plaintiff requested to speak with a supervisor. The officer returned with other officers and "began threatening to kick the plaintiff's ass if he did not cuff up right now." ECF 1, p. 4. Plaintiff states he refused to be handcuffed because he feared he would be beaten. Plaintiff asked to speak to a supervisor and the unit psychologist. *Id.* Officer Wilt directed plaintiff to submit to handcuffing, using racial epithets and again threatening to beat plaintiff. Plaintiff states that he then "jammed his cell door to prevent the door from being abruptly open[ed]." Defendants were unable to open the door so Officer Friend instructed Wilt to "mace" the plaintiff. *Id.* Wilt sprayed mace through the cell door slot. *Id.*

Plaintiff states that Shoemaker shut off the water to his cell. Plaintiff remained in his cell for approximately 30 minutes. He became dizzy and had difficulty breathing. When he advised Wilt of his medical difficulties Wilt told him that he should have come out when directed to and again threatened to beat plaintiff. *Id.*, p. 5.

Officers then began to pull out what plaintiff jammed into the door while pulling on the cell door. An officer was able to pull the door open and entered the cell with an electric shield, slamming plaintiff to the floor, where "officers began to viciously kick and punch [him] with closed fists in his face, head, back, neck, groin, mouth, nose, [and jaw]." *Id.* Plaintiff passed out, was bleeding profusely and had an open wound. Plaintiff was taken to the WCI infirmary for emergency treatment. Plaintiff claims he posed no threat to defendants but was maliciously and sadistically attacked and beaten by them while the supervisory staff failed to intervene. *Id.* p. 5.

2

Attached to the complaint are the affidavits and statements of several inmates who indicate that they observed correctional staff spray mace into plaintiff's cell, heard blows being exchanged, and witnessed plaintiff being brought out of his cell unconscious and/or with his eyes swollen shut. ECF 1-1, p. 1.

Defendants offer that on March 18, 2014, NBCI's Housing Unit 1, where plaintiff was housed, was to be subjected to a "shakedown." ECF 16, Ex. 1, p. 18. Officers arrived at plaintiff's cell door and requested he come to the door and place his hands through the security slot in order to be handcuffed and removed from his cell. *Id.* Plaintiff refused. Wilt instructed plaintiff several times to comply. Plaintiff refused. Plaintiff appeared angry. He stated that the staff and other inmates were poisoning his food and stealing from him. He challenged the officers to remove him from his cell by force. Wilt notified Friend of the situation. Wilt received permission from Assistant Warden Richard Miller to use a planned use of force in order to extract plaintiff from his cell. *Id.* Ex. 1. Wilt arranged for for a video camera to record the extraction. *Id.*, Ex. 1 & 2.

Wilt and Gillum returned to plaintiff's cell in an effort to have plaintiff peaceably removed from the cell. Plaintiff again refused to cooperate. *Id.*, Ex. 1, p. 18, Ex. 2, part 2, 00:01-3:51 (video footage of use of force).[2] Wilt then assembled a use of force team which included Kalbaugh, Peters, Grub, Rounds and Conrad.[3] *Id.*, Ex 2, part 3, 1:07-1:38. The team intended to quickly open the door to the cell, by surprise, and handcuff plaintiff. *Id.*, Ex 1, p. 18, Ex. 2, part 3 00:40 to 1:15.

---

[2] The video is divided into six parts. Citation to the video includes a citation to the part of the video and the time displayed on the bottom of the screen.

[3] Wilt noted that plaintiff had a history of throwing feces and so they intended to bring the shield in order to assist in handcuffing plaintiff. *Id.*

3

The team's effort to quickly enter the cell failed. The door could not be opened quickly and plaintiff attempted to throw a mixture of feces and urine from a container toward the staff as the door was opened. *Id.*, Ex 1, p. 18; Ex. 2, part 3, 3:15-3:35. The officers were unable to open the door quickly because plaintiff barricaded the doorway with papers and magazines. *Id.*, Ex. 1, p. 18. The officers closed the door, regrouped and retreated from the cell. *Id.*, Ex. 2, part 3, 3:15-3:35.

The officers next decided to dispense pepper spray into the cell while ordering plaintiff to cooperate with staff. At approximately 12:50 p.m., the team returned to plaintiff's cell along with Sgt. Farris. *Id.*, Ex. 1, p. 18. Farris brought an MK 46 with application wand, a devise which allows officers to dispense pepper spray into the cell. *Id.*, Ex. 1, p. 18, Ex. 2, part 4, 3:20-3:40. On seven different occasions pepper spray was dispensed into plaintiff's cell. Each time, officers repeatedly directed plaintiff to come to the door to be handcuffed, but he refused. *Id.*, Ex. 2, part 4, 3:20-40, 8:12-9:00, 11:15-11:45, 18:06-18:26, 18:50-19:00, 27:01—27:17, 27:48-27:55.

On each occasion the pepper spray was dispensed either under the cell door or though the security slot in the middle of the door. Wilt and Farris alternated dispensing the pepper spray. Wilt used a smaller can referred to as an MK 9, while Farris continued to use the MK 46. *Id.*; *see also id.*, Ex 1, p. 18. Plaintiff was observed standing in front of the cell window with paper up his nose and a cloth over his mouth. He continued to refuse to comply. Wilt ordered Farris to go the rear of the cell and dispense pepper spray through the back window. *Id.*, Ex. 1, p. 18. Plaintiff continued to refuse to comply and responded with hostility, including spreading excrement from his cell onto the tier under his door. *Id.*, Ex. 2, part 4, 4:50-5:15. Additionally,

4

when the slot was opened by staff, plaintiff threw urine and feces onto defendants. *Id.*, Ex. 2, part 4 11:45-11:51, 18:06-18:26, 20:40-20:55; Ex 1, p. 18. Plaintiff's efforts impeded defendants' use of pepper spray as they needed to spray quickly and then close the slot in order be avoid being hit by excrement.

Plaintiff appeared unaffected by the pepper spray, standing at the cell door, talking to the officers, refusing their requests, shadow boxing, bouncing up and down in front of the window, and exhibiting erratic behavior. *Id.*, Ex 2, part 4, 13:30-15:20. Eventually, after 32 minutes during which the officers deployed pepper spray in short bursts and requested plaintiff comply with orders to be handcuffed, plaintiff sat on his bunk. Plaintiff continued to refuse to be handcuffed. *Id.*, Ex. 2, part 4, 31:30.

Concerned for plaintiff's safety Wilt then ordered he be forcibly extracted from the cell. *Id.*, Ex 1, p. 18. The cell door and floor was covered in feces and urine. As the team entered the cell plaintiff charged toward the officers, throwing punches, at Karbaugh and Rounds attempting to hit them. *Id.*, Ex. 2, part 4, 32:00-32:20; Ex 1, p. 18. Kalbaugh, in an attempt to defend himself and gain control of plaintiff also threw punches at plaintiff. *Id.* Plaintiff was knocked to the floor in the initial confrontation where the officers struggled to place him in restraints. After approximately two minutes the officers were able to secure plaintiff who was then carried out of his cell to the medical room. *Id.*, Ex 1, p. 19, Ex 2, part 4, 31:30-35:15.

Plaintiff was treated in the medical room by Nurse Krista Swann. *Id.*, Ex 1, p. 8. Swann observed injuries including bilateral eye swelling and bruising, a laceration on his right cheek, and an abrasion on the side of his head. *Id*, p. 56. Swann cleaned plaintiff's cuts. His nose was bleeding. *Id.*, Ex. 2, p. 4, 39:00-43:00.

5

Officers removed the leg irons for plaintiff to walk to the shower. Plaintiff stated that he could not walk because his food had been tainted, affecting his balance. *Id.*, part 4, 41:50-42:09. Defendants picked him up and carried him to the holding cell. *Id.*; *see also* Ex 1, p. 19. While under escort to the holding cell plaintiff attempted to slip through his handcuffs; however, officers retained control over him. *Id.*, Ex. 2, part 4, 43:20-44:00.

Plaintiff was photographed. *Id.*, Ex 1, p. 19, 67-68, Ex 2, part 4, 47:15-48:10. He was carried to an observation holding cell, placed under observation and the psychological team was called. *Id.*, Ex. 1, p. 19, Ex. 2, part 4, 49:00-50:00; part 5, 00:00-1:39.

As a result of the incident, plaintiff was charged criminally with two counts of second degree assault and two counts of "contact with bodily fluid." *Id.*, Ex 1, p. 10. He was also charged and found guilty of institutional rule violations: Rule 100 (engaging in a disruptive act); Rule 101 (committing an assault or battery on staff); Rule 105 (possessing, using or manufacturing a weapon); and Rule 116 (possessing, misusing or tampering with security).

Standard of Review

A. Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 563. The court

need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979).

B.     Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

7

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## Analysis

### A. Respondeat Superior

Plaintiff has pointed to no personal involvement on the part of Defendants Iser, Bohrer, Friend and Bishop, regarding the use of force. As such his complaint against Iser, Bohrer,

Friend and Bishop is subject to dismissal. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir.1985) ("In order for an individual to be liable under § 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." (internal punctuation omitted)). To the extent plaintiff premises his claim against Iser, Bohrer, Friend and Bishop on the basis that they held supervisory positions, the law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Plaintiff has pointed to no action or inaction on the part of Iser, Bohrer, Friend and Bishop related to his injuries. His complaint against them shall be dismissed.

B. Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkens v. Gaddy*, 599 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 34.

In the context of the use of pepper spray by prison staff, "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 440 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (emphasis omitted). The use of pepper spray is not "per se a cruel and unusual punishment." *McCargo v. Mister*, 462 F.Supp. 813, 818 (D. Md. 1978). It may be used in order to control recalcitrant inmates. *Williams*, 77 F. 3d at 763. Analysis regarding the amount of chemical agent used focuses, as with all other excessive force claims, on whether the defendant acted with a sufficiently culpable state of mind. *Iko*, 535 at 238 (4th Cir. 2008) (citations omitted) (holding correctional officer not entitled to qualified immunity where

10

additional chemical agent was deployed into inmate's cell after inmate attempted to comply with officer's order, did not react violently, and officer failed to remove inmate's clothes or secure medical care for inmate after chemical agent exposure).

Eighth Amendment violations have been found where an officer used more than a reasonable amount of a chemical agent. *See, e.g., Furnace v. Sullivan,* 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and other officer also joined in); *Lawrence v. Bowersox,* 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff,* 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier). However, where an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams,* 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan,* 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick,* 918 F.Supp. 977, 984 (N.D.W.Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown). Use of chemical agents is reasonable when, as here, an officer is attempting to maintain order and discipline in the institution. *Santiago v. Walls,* 599 F.3d 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson,* 315 F.3d 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Here, the use of force was necessary to maintain discipline, gain control of a combative inmate, and for the safety of the inmate, officers, and other inmates. Plaintiff repeatedly refused to comply with officers' direct orders to submit to handcuffing. He refused repeated attempts to leave the cell peacefully. Plaintiff threw feces and urine at staff on several occasions, assaulting them as they attempted to gain his compliance. He barred his cell door so that the officers could not easily enter his cell. He also spread excrement onto the prison tier, creating a hazard for himself, the officer, and other inmates. When officers finally entered the cell after attempting to negotiate with him, he charged and attacked them. Clearly the force used in the instant case was necessary.

Moreover, defendants attempted to temper the amount of force used by negotiating with plaintiff for his removal from the cell, then employing pepper spray, and only finally physically extracting him. The evidence shows that plaintiff resisted all efforts by defendants to negotiate with him for his removal from the cell and in fact assaulted the officers by throwing excrement on them and hitting them when they finally entered his cell.

Plaintiff's injuries were minor. His eyes were swollen and he had abrasions. Plaintiff fought with the officers who entered the cell in order to handcuff him. Once officers handcuffed plaintiff they carried him from the cell for immediate medical treatment. The record "falls far short" of showing there was "no plausible basis for [defendants'] belief that this degree of force was necessary." *Whitley,* 475 U.S. at 323.

## Conclusion

Defendants' dispositive motions will be granted. A separate order follows.

Date: 7/24/15

J. Frederick Motz
United States District Judge

13